# EXHIBIT 7

1    James R. Walsh, No. 51764
     Edward M. Keech, No. 48098

2    **WALSH LAW FIRM**
     Attorneys at Law

3    3443 Golden Gate Way, Suite F
     Lafayette, CA 94549

4    Telephone:     925.284.7400
     Facsimile:      866.406.8863

5    Email:        jwalsh@walsh-law.com

6    Attorneys for Proposed Intervenor
     MEDICAL DEVELOPMENT INTERNATIONAL

7

8            IN THE UNITED STATES DISTRICT COURT

9

10         FOR THE NORTHERN DISTRICT OF CALIFORNIA

11    MARCIANO PLATA, et al.,         No. C01-1351 TEH

12           Plaintiff,

13       v.

14

15    ARNOLD SCHWARZENEGGER,
     et al.,

16

17           Defendant.

18

19

20     **NOTICE OF MOTION AND MOTION FOR INSTRUCTIONS; BRIEF IN
     SUPPORT OF MOTION FOR INSTRUCTIONS**

21           **Date:_____2007**

22

23           **Time:_____A.M.**

24

25

26

27

28

                                                      No. C01-1351 TEH

ORIGINAL

RECEIVED

07 APR -3 PM 3:05

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

I hereby certify that the annexed
instrument is a true and correct copy
of the original issued in my office.
ATTEST:
     RICHARD W. WIEKING
Clerk, U.S. District Court
Northern District of California
By _____ Deputy Clerk
Date _____

# TABLE OF CONTENTS

I.   ISSUE TO BE DECIDED ............................................................................ 1

II.  FACTS ...................................................................................................... 1

   A.   SUMMARY ......................................................................................... 1

   B.   STATUS OF MDI'S CONTRACT ........................................................ 5

   C.   RECENT DEVELOPMENTS ............................................................... 7

III. ARGUMENT ............................................................................................ 8

   A.   Introduction ......................................................................................... 8

   B.   MDI Does Not Need A License ............................................................ 9

      1.   This Court Is the Appropriate Source of a Ruling that MDI Does Not Need a License ............................................................... 9

      2.   MDI Is Not Engaged in Practice of Medicine, Corporate or Otherwise. ................................................................................. 10

         a.   The Unlicensed Practice of Medicine. ................................. 10

         b.   Corporate Practice of Medicine. ......................................... 10

         c.   Medical Board Guidelines ................................................... 11

         d.   The 1991 Future Diagnostics, Inc. Opinion ......................... 12

         e.   The 2003 Workers Comp Litigation Again Raised And Dismissed Such Claims ...................................................... 13

         f.   Business & Professions Code § 2481, Enacted In 2005, Applies. .............................................................................. 14

         g.   The Receiver's Counsel's Reliance on Attorney General Opinion 00-206 Is Misplaced .................................. 16

   C.   MDI Should Not Be Compelled Under Threat of Retaliation to Continue to Provide Services to the Pilot Project Without Current Payment and an Acknowledged Contract ........................................... 17

IV.  CONCLUSION ........................................................................................ 18

No. C01-1351 TEH

1

2

## TABLE OF AUTHORITIES

**Cases**

3

4

California Medical Ass'n v. Regents of University of California, 79 Cal.
   App. 4th 542, 550 (2000) ...................................................................... 11

5

Conrad v. Medical Bd. of California, 48 Cal. App. 4th 1038, 1042-1043 (1996)................. 11

6

Ex parte Greenall, 153 Cal. 767, 770 (1908) ..................................................... 10

7

People v. Pacific Health Corp., 12 Cal. 2d 156, 159 (1938).............................. 11

8

Steinsmith v. Medical Board of California, 85 Cal.App.4th 458, 466 (2000). ................. 11

9

**Statutes**

10

Business & Professions Code §2481 ............................................................... 14

11

Business and Professions Code §2052.......................................................... 10

12

California Business and Professions Code §2400 ........................................ 10, 11

13

Health & Safety Code § 2418. ....................................................................... 14, 15

14

**Other Authorities**

15

Attorney General No. 00-206, 83 Op. Atty. Gen. 170 (2000) ........................................ 16

16

*Future Diagnostics, Inc.*......................................................................... 12

17

*Perspective to Provide Guidance on the Prohibition Against the Corporate
   Practice of Medicine (January, 1999)*........................................................ 11

18

19

20

21

22

23

24

25

26

27

28

No. C01-1351 TEH

NOTICE OF MOTION AND MOTION FOR INSTRUCTIONS; BRIEF IN SUPPORT

1

## NOTICE OF MOTION AND MOTION FOR INSTRUCTIONS

2  TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3          Please take notice that on _____, 2007 at _____ m. or as soon thereafter as

4  counsel in the courtroom of the Hon. Thelton E. Henderson, 450 Golden Gate Avenue,

5  San Francisco, California, Medical Development International ("MDI") will bring before

6  the court its motion for instructions.

7          This motion is based on the Court's Order Appointing Receiver of February

8  14, 2006 and is made upon the ground that in the absence of the Court's guidance to MDI

9  and the Receiver, MDI will be forced to abandon a highly successful pilot program of

10  managing health care services in two California prisons.

11

## BRIEF IN SUPPORT OF MOTION FOR INSTRUCTIONS

12

### I.          ISSUE TO BE DECIDED

13          (1) Whether MDI's organization of a network of health care providers, its

14  scheduling, making prompt payment and providing other administrative support for

15  prisoner medical visits, and its providing sophisticated data management services for

16  prisoner medical records at two Southern California hospitals require a license to practice

17  medicine;

18          (2) Whether MDI, which has over $2.6 million in unpaid invoices outstanding

19  to CDCR, must continue to provide services to CDCR under threat from the Receiver that

20  if MDI suspends its service, it will "never do business in California again."

21

### II.          FACTS

22  **A.   SUMMARY**

23          In September 2006, MDI undertook a pilot project to assist with the

24  administration of community-based medical services for the prisoners at two Southern

25  California prisons, the California State Prison, Los Angeles County ("LAC") and

26  California Correctional Institution in Tehachapi ("CCI").   Declaration of Theodore

27  Willich In Support Of Motion For Leave To Intervene And Motion For Instructions, filed

28  herewith ("Willich Decl."), ¶ 1.

1   MDI specializes in providing the tools to public and private correctional

2   systems to effectively access community-based healthcare services for incarcerated

3   populations.  MDI's information systems have been used by the Federal Bureau of Prisons

4   for over ten years to arrange for over 250,000 community-based healthcare encounters for

5   inmates.  These services are ordered by and controlled by the individual prison institution

6   staff utilizing MDI's technologies and processes to arrange for inpatient and outpatient

7   hospital and physician services.  Precise and complete accountability is achieved through

8   the use of MDI's centralized patient scheduling system, which facilitates the coordination

9   with custody staff and matches appointments to billings.  Further, MDI maintains an

10   electronic copy of the medical record with the appointment and retains physicians and

11   hospitals through prompt and accurate payment to providers.  Willich Decl., ¶ 2

12   Based upon the premise that the existing health services personnel and custody

13   staff at the individual CDCR facilities have the capability to deliver care in compliance

14   with Plata, MDI started the pilot projects at LAC and CCI working with the available

15   infrastructure.  The results have been spectacular.  Utilizing MDI's tools and assistance,

16   the CCI staff eliminated a back-log of over 100 specialty appointments; reduced the

17   average length of stay for an inpatient from 12 days to 3; dramatically reduced medical

18   grievances; increased the number of specialty services delivered at the prison ten-fold,

19   which itself has preserved precious transportation assets for those with more pressing

20   medical needs.  Based upon the foregoing achievements, the CCI was based on statements

21   from CCI staff and found by a representative of the Prison Law Office, to be meeting the

22   required standards for medical care within three months of the CCI staff beginning to

23   utilize MDI's tools.  Willich Decl., ¶ 3.

24   The results at the LAC have been even more dramatic.  The LAC health

25   services and custody staff eliminated a back-log of over 400 specialty appointments; 250

26   of those were done on-site, again saving transportation and custody resources for those in

27   greatest need; and reduced medical grievances from an average of 350 per month to 120,

28   according to Associate Warden Wofford.  Willich Decl., ¶ 4.

No. C01-1351 TEH

1    There are two fundamental keys to MDI's success.  First, as noted above, MDI

2    offers its state-of-the-art technology to assist with scheduling and tracking inmate

3    appointments, meticulously tracking claims data thereby essentially eliminating duplicate

4    claims and greatly reducing costs to the prison institution.  Second, an essential element in

5    MDI's success is its relationship with the doctors and other heath care providers.  In order

6    to encourage doctors and other health care providers to participate with its network, work

7    at reasonably attractive rates and make prisoner appointments a priority, MDI promises to

8    pay, and does pay, the doctors and other providers promptly, generally within thirty days.

9    Willich Decl., ¶ 5.

10    Specifically, MDI performs the following services:

11    a.  MDI enters into agreements with physicians and hospitals whereby those

12        physicians and hospitals agree to perform medical services at the request of the

13        prison medical staff.

14    b.  MDI works closely with the prison medical staff to provide the framework for

15        excellent, coordinated medical care at a reasonable cost.

16    c.  If an inmate is in need of specialist treatment and such is ordered by the prison

17        medical director, then MDI will set up the appointment with one of the

18        physicians in its network and handle all of the scheduling, logistics and billing

19        requirements and facilitate the transfer of clinical information from the

20        specialist to the prison medical director.

21    d.  If there is no qualified physician that meets the prison's criteria, then MDI will

22        try to find such a physician and make the physician a part of the network.

23    e.  If there is no qualified physician who is a part of the network and one cannot be

24        found, then MDI will assist the prison health services staff to secure the

25        services.

26    f.  All medical decisions initiating the process described above are made by the

27        prison health services staff.

28

- 3 -                          No. C01-1351 TEH

g. All medical decisions regarding tests, treatment and the like are made by a

licensed specialist.

h. MDI is not involved in any medical decisions.

Willich Declaration, ¶29, p. 8.

Since September 2006, MDI has been diligently paying the medical expenses for prisoners at the two prisons incurred by MDI's network. Exhibit A to the Willich declaration is a copy of MDI's current accounts receivable listing for the pilot project. Willich Decl., ¶ 6.

The CDCR paid MDI's invoices for its work with payments in December 2006 and January 2007, as reflected on Exhibit A, for it was a settled feature of the agreement that MDI would be paid within 45 days of its invoices. Willich Decl., ¶ 7.

In December 2006, MDI was informed that the Receiver had suspended any further payments to MDI pending the Receiver's review of MDI's contract. The last payments from CDCR were received by MDI on January 12, 2007.   In the two and one-half months since, MDI has received no payments from CDCR. Notwithstanding the Receiver's actions, the CDCR continues to utilize MDI's services with the Receiver's knowledge and consent. The account receivable has grown to more than $2.6 million and it was increasing at the rate of about $700,000 per month. Willich Decl., ¶ 8.

Since December 2006, MDI has had a number of meetings and/or other discussions with the Receiver and his representatives. In those discussions, the Receiver has communicated the following contradictory messages to MDI:

a. MDI is purportedly not properly licensed for the services it is providing;

b. MDI will not be paid until the contract and licensing situation is resolved;

c. Although MDI is allegedly not properly licensed and is not being paid

currently, MDI has been instructed by the Receiver that it must continue work

on the pilot project;

d. MDI is doing a good job in the pilot project;

e. If MDI stops work on account of the license issue or the lack of current

- 4 -

1    payment, the Receiver will make sure that MDI, in the Receiver's own words,

2    "never works in California again." Willich Decl., ¶9.

3    **B.    STATUS OF MDI'S CONTRACT**

4    The status of MDI's contract is as follows:  Negotiations with Dr. Peter Farber-

5    Szekrenyi, then the Director, Division of Correctional Health Care Services at CDCR,

6    over the pilot project began in earnest with MDI's proposal of March 8, 2006. See,

7    Exhibit B to the Willich Declaration.  Willich Decl., ¶ 10.

8    In late August or early September 2006, CDCR provided MDI with a copy of

9    CDCR documents asserting that these signed documents demonstrate contract approval

10   and requested that MDI start work. Dr. Peter Farber-Szekrenyi explicitly represented to

11   MDI that MDI would be paid for all services rendered to CDCR.  Willich Decl., ¶11.

12   Darc D. Keller, then the Assistant Secretary, Office of Health Care Policy at

13   CDCR, told MDI that it is common practice within CDCR for its contractors and

14   providers to start work before the final contractual form is approved provided by the

15   California Department of General Services.  Further, MDI was led to believe that the

16   CDCR people had kept the Receiver informed and that he was aware of, and approved of,

17   MDI's contract.  In addition, MDI understood that there was an emergency at these two

18   prisons, just as there was at others in California, and we assumed that getting us to work

19   immediately was part of California's response to that crisis.  Willich Decl., ¶ 12.

20   MDI's belief that there was a generally shared view that it was essential for

21   MDI to get to work immediately was bolstered by the initial payments of MDI's invoices,

22   described above.  Willich Decl., ¶ 13.

23   As recently as March 8, 2007, it has suited the convenience of CDCR officials

24   to assert that CDCR has a contract with MDI.  The letter, Exhibit C to the Willich

25   Declaration, states that the listed health care providers are under contract to the prison.  In

26   fact most of them are not.  Almost all of those doctors are part of the network that MDI

27   assembled for the pilot project.  The contracts that connect CDCR with those doctors in

28   the network are: (1) CDCR's contract with MDI, and (2) MDI's contracts with the doctors

- 5 -                    No. C01-1351 TEH

1   and providers.  Willich Decl., ¶14.

2          The effect of MDI's having assembled an efficient network of doctors and

3   other providers and not receiving payments is that MDI is essentially financing all the

4   costs, not merely the costs of administering the project, but also the costs of actually

5   paying the medical bills of the State of California for prisoner health care at LAC and

6   CCI.  Willich Decl., ¶15.

7          In late December 2006 or early January 2007, MDI was informed by the

8   CDCR staff that the Receiver had "seized" the contract and begun an investigation.  At

9   about the same time, MDI learned from Dr. Farber-Szekrenyi that it was possible that

10  CDCR would conclude MDI needed a medical license to participate in the pilot project.

11  Although MDI does not believe it needs such a license, it nevertheless began to make

12  arrangements for a medical licensed company to perform as prime contractor, and MDI

13  would perform its services as a subcontractor to that contractor.  This suggested

14  arrangement was initially proposed by CDCR.  A draft agreement to this effect was

15  prepared and is attached as Exhibit D to the Willich Declaration.  It was provided to

16  CDCR in December 2006.  Willich Decl., ¶ 16.

17         At CDCR's request, MDI continued to perform its services in the pilot project,

18  and the CDCR continued to pay MDI until mid-January 2007, although some of the

19  earliest invoices remained unpaid, while other later ones had been paid.  Willich Decl., ¶

20  17.

21         On February 16, 2007, Timothy E. Heffernan, Esq., who is MDI's lawyer,

22  Mark Nobili and Theodore Willich attended a meeting with the Receiver, his chief of staff

23  and at least half a dozen other persons attending on behalf of the Receiver's office.  At

24  that meeting the Receiver stated that he was told that MDI was doing "a good job," but

25  may need a medical license.  The Receiver indicated that if an opinion were provided to

26  show him to the contrary, he would "think" about paying MDI's back invoices.  Mr.

27  Heffernan commented that MDI may decide not to continue to conduct the pilot project

28  without current payment, and the Receiver said that it was necessary for MDI to continue

NOTICE OF MOTION AND MOTION FOR INSTRUCTIONS; BRIEF IN SUPPORT

1  to work on the project, and if MDI withdrew, the Receiver would "make sure MDI never

2  worked in California again." Willich Decl., ¶ 18.  Declaration of Timothy E. Heffernan,

3  filed herewith, ¶ 2.

4      MDI and its network of doctors and hospitals have kept working on the pilot

5  project, and the CDCR has failed to process and pay any MDI invoices.   Willich Decl., ¶

6  19.

7      In response to the Receiver's statement that MDI needed to provide an opinion

8  regarding the licensing issue, MDI provided an opinion letter to that effect to the Receiver

9  on March 7, 2007.  A copy of that letter is attached as Exhibit E to the Willich

10  Declaration.  Willich Decl., ¶ 20.

11  **C.   RECENT DEVELOPMENTS**

12      On several occasions since the delivery of the March 7 letter, MDI has

13  attempted to meet with the Receiver by having counsel try to arrange a meeting through

14  Mr. Dodd, the recipient of the March 7 letter.  MDI has received only vague indications

15  that a meeting might be possible.   All the while, MDI has kept working and the CDCR

16  has continued not to pay.  Willich Decl., ¶ 20

17      MDI is unable and unwilling to continue to underwrite medical treatment for

18  California prisons without receiving prompt reimbursement.  $700,000 per month in

19  unpaid invoices, many dating back to 2006, now totaling more that $2.6 million, is simply

20  more than MDI will bear.  Willich Decl., ¶ 22.

21      In light of the continuing non-payment and the amassing of a $2.6 million

22  receivable, MDI has recently been forced to cut back its services in the pilot program.

23  Upon doing so, MDI received a copy of the following email from a staffer at CCI:

24      FYI:

25      I received a call from Kim @ MDI this morning - she informed me
that MDI is cancelling [sic] all high-dollar procedures & on-site

26  specialties at this time due to non-payment of services. We have 10
I/M's scheduled for surgery within the next 4 wks. that will be

27  cancelled, not to mention Oncology scans and 1 I/M who is
supposed to get heart surgery. I have many I/M's who were to be

28  seen on-site by the General Surgeon & Ophthalmologist.  If all

1   these appointments are cancelled it will put CCI way out of
    compliance with Plata.
2

3   Willich Decl., ¶ 23.

4           On March 26, 2007, the Receiver's counsel sent a letter to MDI's lawyer, Mr.

5   Heffernan. A copy is attached as Exhibit F. Heffernan Decl., ¶ 3.

6           The letter demands an opinion from the California Medical Board within ten

7   days on whether MDI needs a license to undertake its pilot projects at California State

8   Prison, Los Angeles County ("LAC") and California Correctional Institution in Tehachapi

9   ("CCI"). There is no reason to believe that the California Medical Board provides such

10  advisory opinions within ten days. Willich Decl., ¶ 25; Heffernan Decl. ¶ 4.

11          In the same letter, the Receiver's counsel also demands that MDI provide

12  sensitive and confidential information about its contract rates with doctors and providers.

13  MDI offered to do so, but requested that the Receiver agree to a confidentiality agreement

14  to ensure that the information not be otherwise used or disseminated in the marketplace.

15          MDI is not trying to conceal its pricing structure from the Receiver. MDI's

16  bills have been submitted to CDCR and available since November. Willich Decl., ¶ 26;

17  Heffernan Decl., ¶ 5.

18          MDI is not seeking an "out" from its contract. It does not want to stop work.

19  MDI believes it is doing a good job and an important service, and MDI desires to

20  continue; moreover, the contract will compensate MDI if its payments are made promptly.

21  And finally, MDI is committed to the pilot project because it is a good model – a model

22  that works in California just as it works pursuant to contracts between MDI and the

23  Federal Bureau of Prisons – and a model that may be of substantial benefit to California in

24  solving its prisoner health care crisis fairly quickly. Willich Decl., ¶27.

25                          **III.   ARGUMENT**

26      **A.   Introduction**

27          Finding itself threatened by the Receiver while under an obligation to

28  cooperate with the Receiver, unpaid by CDRC while unable to sustain the on-going

                                        - 8 -                    No. C01-1351 TEH

expenses of the program without prompt payment from CDRC, and unwilling to abandon the prisoners it serves and the network of doctors and other providers that it has assembled, MDI seeks the assistance of this Court in the form of instructions to itself and the Receiver to resolve the predicament over licensing, contracting, MDI's outstanding invoices, MDI's obligation to keep working without an acknowledged contract or payment, and the Receiver's threats against MDI if it does stop working.

The Receiver simply cannot have it both ways. The cooperation clause in the Court's Order Appointing Receiver cannot be allowed to place MDI in a predicament where it has no contract and yet where it is obligated not to stop work. MDI has no legal obligation aside from its contract to work for the Receiver. MDI's goals in this situation should not be misunderstood. It has no desire to stop working in the prisons where it is working and achieving success. Nor is it attempting to use any threat of stopping work to improve upon the terms under which it started to work in September 2006. It simply wants its contract to be recognized and performed.

Nor can the Court's Order of February 14, 2006 be seen as to authority to the Receiver to demand and encourage performance by MDI while at the same time withholding payments for the very cash flow that make MDI's remarkably successful performance possible.

**B.   MDI Does Not Need A License**

   **1.   This Court Is the Appropriate Source of a Ruling that MDI Does Not Need a License**

The Receiver's counsel has demanded that MDI obtain from the California Medical Board an advisory opinion that it does not need a license to continue its work on the pilot project in Southern California. MDI has no reason to believe that the Medical Board would provide an opinion within the time frame allowed by Mr. Dodd's letter. More importantly, a court is the final authority over whether a contract is legal or illegal, and this Court has a special interest in determining whether MDI needs a license to

1   perform the services necessary to make the pilot project the success that it has been.

    **2.   MDI Is Not Engaged in Practice of Medicine, Corporate or Otherwise.**

        **a.      The Unlicensed Practice of Medicine.**

5         MDI is not practicing medicine without the being licensed as required by

6   Business and Professions Code §2052. This statute requires that any person who practices

7   "any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats,

8   operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement,

9   disorder, injury, or other physical or mental condition of any person" have a valid

10   license. "To bring a person within the provisions of the act, it must appear that he

11   practices, or attempts to practice medicine, etc., as a business or calling, or advertises,

12   or holds himself out as so doing..." Ex parte Greenall, 153 Cal. 767, 770 (1908).

13         As discussed in detail above, MDI's services do not in any way involve the

14   professional decision-making that constitutes the practice of medicine. It is the prison

15   physician who determines the need for medical intervention and the specialist who

16   establishes the system or mode of treating the patient. MDI only schedules appointments

17   ordered by the physician. Further MDI does not diagnose anyone, only the treating

18   physician does that. Nor does MDI prescribe any test — all that MDI does is facilitate the

19   scheduling of tests and diagnostic tools *already prescribed by the physician.* Further, MDI

20   plays no role whatsoever in the diagnosing of any kind of disease or injury. All of the

21   medical decisions made regarding the patient are made either before MDI's

22   involvement or after.

        **b.    Corporate Practice of Medicine.**

24         The corporate practice of medicine is barred by California Business and

25   Professions Code §2400 et seq. That statute provides that "[c]orporations and other

26   artificial legal entities shall have no professional rights, privileges, or powers..." The

27   principal purpose of Section 2400 is "to protect the professional independence of

28   physicians and to avoid the divided loyalty inherent in the relationship of a physician

1  employee to a lay employer." <u>California Medical Ass'n v. Regents of University of
2  California</u>, 79 Cal. App. 4[th] 542, 550 (2000). The statute is meant to "ameliorate 'the
3  evils of divided loyalty and impaired confidence' which are thought to be created when a
4  corporation solicits medical business from the general public and turns it over to a
5  special group of doctors, who are thus under lay control." <u>Conrad v. Medical Bd. of
6  California</u>, 48 Cal. App. 4th 1038, 1042-1043 (1996) (<u>quoting</u>, <u>People v. Pacific Health
7  Corp.</u>, 12 Cal. 2d 156, 159 (1938)).

8          The test for corporate practice is whether the professional independence of the
9  physicians has been compromised and whether there exists a "secondary and divided
10  loyalty to the patient." <u>Steinsmith v. Medical Board of California</u>, 85 Cal.App.4[th] 458,
11  466 (2000). Where this divided loyalty and control does not exist, there is no corporate
12  practice of medicine.

13              **c.    Medical Board Guidelines**

14          The Medical Board of California has provided some guidance in this area by
15  publishing its *Perspective to Provide Guidance on the Prohibition Against the Corporate
16  Practice of Medicine* (January, 1999). It stated that the fundamental policy behind Section
17  2400 is to prevent "unlicensed persons from interfering with or influencing the
18  physician's professional judgment." The publication then specified a non-inclusive
19  list of decisions that should always be made by a licensed physician, including
20  determining which diagnostic tests are appropriate, and decisions regarding the ultimate
21  overall care of the patient.

22          None of the factors for determining whether a business is engaged in the
23  corporate practice of medicine listed in the Medical Board's *Perspective* exist here. The
24  following chart lists the factors followed by an explanation of why MDI's practices do not
25  meet the definition:

26

27

28

No. C01-1351 TEH

NOTICE OF MOTION AND MOTION FOR INSTRUCTIONS; BRIEF IN SUPPORT

| Factor | MDI's Role |
|---|---|
| 1) Determining what diagnostic tests or treatment are appropriate. | 1) Only the prison physician determines which tests or specialists are appropriate. MDI plays no part in this decision. |
| 2) Determining the need for referral to or consultations with another physician/specialist. | 2) MDI simply never advises a physician or patient on the need for referrals. This is done by the prison medical staff. |
| 3) Responsibility for the ultimate overall care of the patient, including treatment options. | 3) The treating physician retains all responsibility for the ultimate care and treatment options for the patient. MDI makes no decisions regarding either. |
| 4) Determining how many patients a physician must see in a given period or how many hours a physician must work. | 4) MDI does not in any way influence a physician's number of patients or working hours. |
| 5) Ownership of patient's records. | 5) MDI acts only as a ministerial messenger for patient records, only forwarding prescriptions and test results to the appropriate parties. |
| 6) Selection of professional staff. | 6) MDI has no role in the selection of either the prison physician or what specialist should be consulted. MDI does have a network of physicians. |
| 7) Decisions regarding the coding and billing procedures for patient care services. | 7) MDI does not make decisions for coding and billing. However, MDI does check for accuracy and consistency. |
| 8) Approval of the selection of medical equipment for the practice. | 8) MDI has no role in the selection of the tests or the machines to be used. This is done by the prison doctor and any referred specialist. |

### d.   The 1991 Future Diagnostics, Inc. Opinion

This precise issue was brought up before the Medical Board in 1991 in the matter of *Future Diagnostics, Inc.*

In an opinion letter dated August 2, 1991 from Mr. Jeff Marschner, of the Legal Affairs Division of the Department of Consumer Affairs, the jurisdiction of which

- 12 -

No. C01-1351 TEH

1  includes the Medical Board of California, addressed the issues involved here. A copy is

2  part of Exhibit C to the Willich Declaration. The opinion is addressed to an attorney

3  representing Future Diagnostics, Inc. ("FDI"). FDI was a management services

4  organization engaged in the same business with a very similar business model as MDI. As

5  you can see from the letter, the Legal Affairs Division issued an opinion that FDI's

6  practices did not constitute the corporate practice of medicine. Rather, the legal

7  conclusion of the division was that FDI's role was analogous to "that of a 'messenger' or

8  intermediary in a relationship between insurers and a preferred provider organization."

9  This opinion was correct as a matter of law – FDI was not engaged in the

10  corporate practice of medicine in 1991.

11  Even independent of the correctness of this legal opinion, the fact that

12  the Legal Affairs Division issued this opinion over fifteen years ago to an industry that

13  has saved the state of California millions of dollars in the intervening period certainly

14  creates a justifiable reliance and a legal presumption that would be very difficult to

15  overcome.

16      **e.**    **The 2003 Workers Comp Litigation Again Raised**
    **And Dismissed Such Claims**

17

18  In 2002-2003 the Medical Board again considered "claims" by physician

19  owned organizations that companies similar to MDI but in the Workers Compensation

20  field were engaged in (a) the unlicensed practice of medicine and/or (b) the corporate

21  practice of medicine. We represented all of the respondents: *Professional Diagnostics*

22  *Management, Inc. (Control #02-2002-136881); One Call Medical, Inc. (Control #02-*

23  *2002-136879); Magnetics Imaging Services, Inc. (Control #02-2002-136874).* The facts

24  are startlingly similar.

25  In these cases the respondents were organizations that acted as

26  intermediaries between workers compensation insurance carriers, treating physicians and

27  imaging institutions. The respondents entered into contracts with the insurance carriers to

28  arrange the MRIs and similar diagnostic procedures when approved by the insurance

- 13 -                    No. C01-1351 TEH

1  company. They also entered into contracts with imaging facilities to perform the tests at

2  set rates and under specific guidelines for furnishing results. When the injured workers'

3  treating physician (analogous to the prison doctor) wanted a diagnostic MRI he would

4  seek approval of the insurance carrier who would then instruct the doctor to schedule the

5  appointment through one of the respondents. The respondents provided scheduling,

6  reminders to the patient, ensured proper transportation, handled the billing, made sure that

7  records and results were promptly transmitted and paid the bills, including those to the

8  imaging facility and its radiologist.

9      After extensive briefing and factual investigation, the Medical Board

10 found in favor of all respondents:

11          In reviewing [respondent's] business and procedures for
            conducting business, the Board did not find that this referral service
12          in violation of the Medical Practices Act.

13 It is noteworthy that the Medical Board specifically affirmed the 1991 Counsel's

14 Opinion as an expression of existing law and controlling in this proceeding in 2003.

15          **f.    Business & Professions Code § 2481, Enacted In
                    2005, Applies.**
16

17      In 2005 the California legislature enacted Business & Professions Code

18 §2481. It expressly states that it is an expression of existing law.[1]  Commonly known as

19 the *locum tenens* agency act, section 2481 wanted to recognize a practical and time-tested

20 solution to a looming medical crisis in California. The statute begins with a strong finding

21 of need.[2] It then contains two sections that are important to MDI's analysis.

22

23 [1]  "It is the intent of the Legislature that this section confirm and be declaratory of, rather than
24 change, existing law."  § 2481 (g).

25      [2] (a) The Legislature hereby finds and declares all of the following:
        (1) The State of California is facing a growing crisis in physician supply due, in part, to
26 difficulties in recruiting and retaining physicians.
        (2) This crisis is particularly harsh for facilities operated by the state and local
27 governments due to the difficulties of funding full-time medical staff.
        (3) Locum tenens physicians provide a critical source of medical services that virtually all
28 hospitals in California use at one time or another every year.

NOTICE OF MOTION AND MOTION FOR INSTRUCTIONS; BRIEF IN SUPPORT

First, "(b) Notwithstanding any other provision of law, a "locum tenens agency" shall not be deemed to be an employer, employment agency, employment counseling service, job listing service, nurse's registry, temporary services employer, or leasing employer of a licensee." As noted in the act and consistent with the Medical Board positions for over fifteen years, this kind of agency is not engaged in improper conduct and is clearly allowed.

Second, section (c) contains the definition of a *locum tenens* agency. MDI clearly qualifies:

| Section | MDI's position |
|---|---|
| (1) Contracts with clients or customers to identify licensees willing to perform *locum tenens* services and to arrange for the licensees to perform *locum tenens* services for the clients or customers on a temporary, nonpermanent basis . | This is one of the main functions of the MDI contract with the prisons. |
| (3) Does not determine the rates of payment made to a licensee providing *locum tenens* services, or determine the hours of work by the licensee. | MDI negotiates with the physician to a mutually agreeable rate. It does not "determine" the rate or determine the number of hours. This is negotiated by the physician. |
| (4) Receives payment directly from its clients or customers for its services which, to the degree that the payment includes payment for the *locum tenens* services, remits the payment for the *locum tenens* services in full directly to | MDI bills and remits the payment in full |

(4) The great majority of California hospitals, and many medical groups and other providers, including many state-supported facilities, use locum tenens agencies either continuously or from time to time to help fill their medical staffing needs.

(5) Most locum tenens agencies are barred from employing physicians under the corporate practice doctrine (Article 18 (commencing with Section 2400)) and, thus, do not employ the physicians whose locum tenens services they arrange.

Business & Professions Code § 2481.

- 15 -

| | |
|---|---|
| the licensee. | |
| (5) Charges fees that are reasonably related to the value of the services that the *locum tenens* agency provides its clients and customers, and that are in no way related to the quantity or value of *locum tenens* services provided by the licensee. This section does not prohibit a *locum tenens* agency from charging its clients and customers based on the number of days or hours that the *locum tenens* services are provided or based on the particular specialty of the *locum tenens* services. | MDI proposes a pricing model under which CDCR will be billed an administrative fee on a "per inmate per day" basis, which will be at a rate of $0.70 per inmate per day. This administrative fee represents a reasonable amount for the value of MDI's services performed under the Contract. See enclosed Pricing Proposal. |

**g.    The Receiver's Counsel's Reliance on Attorney General Opinion 00-206 Is Misplaced**

The Receiver requested, and MDI provided, an opinion of counsel that no license is necessary, relying on the Marschner letter. Exhibit E to the Willich Declaration. The Receiver's counsel has responded by arguing that the decision of the California Attorney General No. 00-206, 83 Op. Atty. Gen. 170 (2000), raises the specter that MDI's contract with CDCR is illegal. But the Receiver's counsel overlooks the critical basis on which these two opinions are distinguishable. In the case before the Attorney General there was no similar network of providers established by the administrator, and it appears that the administrator was free to choose whatever service provider it wanted in each individual case. In the Marschner letter, on the other hand, the Department of Consumer Affairs was presented with a program that involved a complete network of providers and determined that the administrator's role "now seems more analogous to that of a 'messenger' or intermediary in a relationship between insurers and a preferred provider organization." Marschner Letter, p. 4.

In the case of Attorney General's Opinion 00-206, the management services organization would choose providers without organizing a separate network with a group-wide fee structure agreement. There was no basis for confidence that the intermediary

- 16 -

No. C01-1351 TEH

1  would choose make the best choice for the patient.  In the case under consideration in the

2  Department of Consumer Affairs' opinion, the selection of a provider was not *ad hoc*, but

3  rather within a defined network of providers who had all agreed to terms of compensation.

4          This is exactly what MDI does.  It organizes a network of doctors and other

5  providers and provides them incentive to accept prisoner patients.  Within that network

6  the prison doctor is free to refer the patient to any appropriate facility.

7          Moreover, the system of prison medical care is not analogous to the relationship

8  between a labor union's administrator and the union's members.  It must be apparent that

9  in the case of prisoners needing medical, necessarily at the taxpayers' expense, the tasks

10  of assembling the network of physicians to provide the treatments under appropriate

11  conditions and at an acceptable cost is done by prison staff today without any license.

12  Individual prison doctors cannot be expected to waste their professional time performing

13  such administrative tasks.

14          It is clear that administrators skilled in the areas of <u>correctional</u> medical care and in

15  the management in the expenditure of public money must make these decisions for the

16  prisoners.

17          We are, therefore, dealing with a different world from that in which the Attorney

18  General decided, in his opinion 00-206, that a labor union could not enter into a medical

19  management contract on behalf of its members.

20          Just as it is permissible a non-medical corporation to organize and administer

21  treatment through a network of providers who have agreed to the lower rates, it is

22  permissible – and even necessary -- for a non-medical licensee to organize and administer

23  the treatment to prisoners.  The Receiver does not need a license to oversee these services,

24  and MDI does not need a medical license to perform these services in the prisons.

25      **C.   MDI Should Not Be Compelled Under Threat of Retaliation to
              Continue to Provide Services to the Pilot Project Without Current**
26          **Payment and an Acknowledged Contract**

27          MDI seeks instructions that it is not required under the cooperation provision

28  of the February 14, 2006 Order Appointing Receiver to continue the pilot project in the

- 17 -

No. C01-1351 TEH

1   absence of a contract that the Receiver is willing to acknowledge and an assurance of

2   prompt payment of past and future invoices under that contract.  MDI has made every

3   effort to cooperate with the Receiver, and surely this Court did not intend to provide the

4   Receiver with the power to compel the provision of service by contractors without

5   payment and without even acknowledgement of any contract.

6          This request does not call on the Court to make a contract for the parties.  As

7   noted in the Willich Declaration, MDI has always been led to believe that it had a

8   contract.  And Mr. Dodd's letter of March 26 refers to the Receiver's conditional

9   willingness to execute a contract under which MDI will provide services consistent the

10  model in effect at the two pilot project prisons.  Dodd Letter, March 26, 2007, p. 3, final

11  paragraph.

12                    **IV.    CONCLUSION**

13         For all of the foregoing reasons it is respectfully submitted that the Court

14  should decide that and instruct MDI and the Receiver that

15         (1) MDI's services as provided to the pilot projects and LAC and CCI do not

16  constitute the corporate practice of medicine under California law; and

17         (2) MDI has no duty to continue to provide services to the pilot projects under

18  threat of never doing business in California again if it has not received a written contract

19  and an assurance of prompt payment of past and future invoices.

20

21  Dated: April **2**, 2007                    Respectfully submitted,

22                                              WALSH LAW FIRM

23

24                                              By
                                                Edward M. Keech

25
                                                Attorneys for Proposed Intervenor
26                                              MEDICAL DEVELOPMENT
                                                INTERNATIONAL

27

28

                          - 18 -                         No. C01-1351 TEH