# EXHIBIT 8
# (part 1)

ORIGINAL

James R. Walsh, No. 51764
Edward M. Keech, No. 48098
**WALSH LAW FIRM**
Attorneys at Law
3443 Golden Gate Way, Suite F
Lafayette, CA 94549
Telephone:   925.284.7400
Facsimile:   866.406.8863
Email:   jwalsh@walsh-law.com

Attorneys for Proposed Intervenor
MEDICAL DEVELOPMENT INTERNATIONAL

RECEIVED
... - 3 2007

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCIANO PLATA, et al., <br><br> Plaintiff, <br><br> v. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> Defendant. | No. C01-1351 TEH <br><br> DECLARATION OF THEODORE WILLICH IN SUPPORT OF MOTION FOR LEAVE TO INTERVENE AND MOTION FOR INSTRUCTIONS. <br><br> Date: _____ 2007 <br> Time: _____ A.M. |

I hereby certify that the annexed instrument is a true and correct copy of the original issued in my office.
ATTEST:
RICHARD W. WIEKING
Clerk, U.S. District Court
Northern District of California
By_____ Deputy Clerk
Date 10/04/07

I, Theodore Willich, declare as follows:

1. I am the Executive Vice President of Medical Development International ("MDI") in Ponte Vedra Beach, Florida. I have personal knowledge of the facts set forth in this declaration, except as to those matters stated on information and belief, and as to them, I believe them to be true.

2. In September 2006, MDI undertook a pilot project to assist with the administration of community-based medical services for the prisoners at two Southern California prisons, the California State Prison, Los Angeles County ("LAC") and California Correctional Institution in Tehachapi ("CCI").

1    No. C01-1352 TEH
DECLARATION OF THEODORE WILLICH

3. MDI specializes in providing the tools to public and private correctional systems to effectively access community-based healthcare services for incarcerated populations. MDI's information systems have been used by the Federal Bureau of Prisons ("FBOP") for over ten-years to arrange for over 250,000 community-based healthcare encounters for inmates. These services were ordered by and controlled by the individual prison institution staff utilizing MDI's technologies and processes to arrange for in and outpatient hospital and physician services. Precise and complete accountability is achieved through the use of MDI's centralized patient scheduling system, which facilitates the coordination with custody staff and matches appointments to billings. As part of this process, MDI maintains an electronic copy of the medical record with the appointment. Further, MDI successfully retains physicians and hospitals in its network through prompt and accurate payment to providers.

4. Based upon the premise that the existing health services personnel and custody staff at the individual CDCR facilities have the capability to deliver care in compliance with Plata, MDI started the pilot projects at LAC and CCI working with the available infrastructure. The results have been spectacular. Utilizing MDI's tools and assistance, the CCI staff eliminated a back-log of over 100 specialty appointments; reduced the average length of stay for an inpatient from 12 days to 3; dramatically reduced medical grievances; increased the number of specialty services delivered at the prison ten-fold, which itself has preserved precious transportation assets for those with more pressing medical needs. Based upon the foregoing achievements, the CCI was, I am informed and believe based on statements from CCI staff, found by a representative of the Prison Law Office, to be meeting the required standards for medical care within three months of the CCI staff beginning to utilizing MDI's tools.

5. The results at the LAC have been even more dramatic. The LAC health services and custody staff eliminated a back-log of over 400 specialty appointments; 250 of those were done on-site, again saving transportation and custody resources for those in greatest need; and reduced medical grievances from an average of 350 per month to

1 | 120, according to Associate Warden Wofford.

2 |       6. There are two fundamental keys to MDI's success. First, as noted above, MDI offers its state-of-the-art technology to assist with scheduling and tracking inmate appointments, and meticulously tracking claims data thereby essentially eliminating duplicate claims, which greatly reduces costs to the prison institution. Second, an essential element in MDI's success is its relationship with the doctors and other heath care providers. In order to encourage doctors and other health care providers to participate with its network, work at reasonably attractive rates and make prisoner appointments a priority, MDI promises to pay, and does pay, the doctors and other providers promptly, generally within thirty days.

      7. Since September 2006, MDI has been diligently paying the medical expenses incurred by MDI's network for prisoners at the two prisons. Exhibit A to this declaration is a copy of MDI's current accounts receivable listing for the pilot project.

      8. The CDCR paid MDI's invoices for its work with payments in December 2006 and January 2007, as reflected on Exhibit A, for it was a settled feature of the agreement that MDI would be paid within 45 days of its invoices.

      9. In December 2006, MDI was informed that the Receiver had suspended any further payments to MDI pending the Receiver's review of MDI's contract. The last payments from CDCR were received by MDI on January 12, 2007. In the two and one-half months since, MDI has received no payments from CDCR. Notwithstanding the Receiver's actions, the CDCR continues to utilize MDI's services with the Receiver's knowledge and consent. The account receivable has grown to more than $2.6 million and it was increasing at the rate of about $700,000 per month.

      10.    Since December 2006, MDI has had a number of meetings and/or other discussions with the Receiver and his representatives. In those discussions, the Receiver has communicated the following contradictory messages to MDI:

      a. MDI is purportedly not properly licensed for the services it is providing;

      b. MDI will not be paid until the contract and licensing situation is resolved;

3       No. C01-1352 TEH

DECLARATION OF THEODORE WILLICH

      c. Although MDI is allegedly not properly licensed and is not being paid currently, MDI has been instructed by the Receiver that it must continue work on the pilot project;

      d. MDI is doing a good job in the pilot project;

      e. If MDI stops work on account of the license issue or the lack of current payment, the Receiver will make sure that MDI, in the Receiver's own words, "never works in California again."

11. The status of MDI's contract is as follows: Negotiations with Dr. Peter Farber-Szekrenyi, then the Director, Division of Correctional Health Care Services at CDCR, over the pilot project began in earnest with MDI's proposal of March 8, 2006. See Exhibit B to this declaration.

12. In late August or early September 2006, CDCR provided MDI with a copy of CDCR documents asserting that these signed documents demonstrate contract approval and requested that MDI start work. Dr. Peter Farber-Szekrenyi explicitly represented to me that MDI would be paid for all services rendered to CDCR. Exhibit G to this Declaration.

13. Darc D. Keller, then the Assistant Secretary, Office of Health Care Policy at CDCR, told me that it is common practice within CDCR for its contractors and providers to start work before the final contractual form is provided by the California Department of General Services. Further, I was led to believe that the CDCR people had kept the Receiver informed and that he was aware of, and approved of, MDI's contract. In addition, MDI understood that there was an emergency at these two prisons, just as there was at others in California, and we assumed that getting us to work immediately was part of California's response to that crisis.

14. My belief that there was a generally shared view that it was essential for MDI to get to work immediately was bolstered by the initial payments of MDI's invoices, described above.

15. As recently as March 8, 2007, it has suited the convenience of CDCR

officials to assert that CDCR has a contract with MDI. The attached letter, Exhibit C, states that the listed health care providers are under contract to the prison. In fact most of them do not directly contract with CDCR. Almost all of those doctors are part of the network that MDI assembled for the pilot project. The contracts that connect CDCR with those doctors in the network are: (1) CDCR's contract with MDI, and (2) MDI's contracts with the doctors and providers.

16. The effect of MDI's having assembled an efficient network of doctors and other providers and not receiving payments is that MDI is essentially financing all the costs, not merely the costs of administering the project, but also the costs of actually paying the medical bills of the State of California for prisoner health care at LAC and CCI.

17. In late December 2006 or early January 2007, the CDCR staff informed MDI that the Receiver had "seized" the contract and begun an investigation. At about the same time, I learned from Dr. Farber-Szekrenyi that it was possible that CDCR would conclude that MDI needs a medical license to participate in the pilot project. Although MDI does not believe it needs such a license, it nevertheless began to make arrangements for a medical licensed company to perform as prime contractor and MDI would perform its services as a subcontractor to that contractor. This suggested arrangement was initially proposed by CDCR. A draft agreement to this effect was prepared and is attached as Exhibit D. It was provided to CDCR in December 2006.

18. At CDCR's request, MDI continued to perform its services in the pilot project, and the CDCR continued to pay MDI until mid-January 2007, although some of the earliest invoices remained unpaid, while other later ones had been paid.

19. On February 16, 2007, Timothy E. Heffernan, Esq., who is MDI's lawyer, Mark Nobili and I attended a meeting with the Receiver, his chief of staff and at least half a dozen other persons attending on behalf of the Receiver's office. At that meeting the Receiver stated that he was told that MDI was doing "a good job," but that MDI had an illegal contract and may need a medical license. With regard to a license,

the Receiver indicated that if an opinion were provided to show him to the contrary, he would think about paying MDI's back invoices and may negotiate a new contract with MDI. Mr. Heffernan commented that MDI may decide not to continue to conduct the pilot project without current payment, and the Receiver said that it was necessary for MDI to continue to work on the project, and if MDI withdrew, the Receiver would "make sure MDI never worked in California again." As a result, MDI continued to provide its services to CDCR pending ongoing negotiations over issuance of a new contract.

20. MDI and its network of doctors and hospitals kept working on the pilot project, and the CDCR has failed to process and pay any MDI invoices.

21. In response to the Receiver's statement that MDI needed to provide an opinion regarding the licensing issue, MDI provided an opinion letter to that effect to the Receiver on March 7, 2007. A copy of that letter is attached as Exhibit E.

22. On several occasions since the delivery of the March 7 letter, MDI has attempted to meet with the Receiver and negotiate issuance of a new contract by having Mr. Walsh try to arrange a meeting through Mr. Dodd, the recipient of the March 7 letter. MDI has received only vague indications that a meeting might be possible. All the while, MDI has kept working and the CDCR has continued not to pay.

23. MDI is unable and unwilling to continue to underwrite medical treatment for California prisons without receiving prompt reimbursement. $700,000 per month in unpaid invoices, many dating back to 2006, now totaling more that $2.6 million, is simply more than MDI will bear.

24. In light of the continuing non-payment and the amassing of a $2.6 million receivable, MDI has recently been forced to cut back its services in the pilot program. Upon doing so, MDI received a copy of the following email from a staffer at CCI:

> FYI:
>
> I received a call from Kim @ MDI this morning - she informed me that MDI is cancelling [sic] all high-dollar procedures & on-site specialties at this time due to non-payment of services. We have 10

I/M's scheduled for surgery within the next 4 wks. that will be cancelled, not to mention Oncology scans and 1 I/M who is supposed to get heart surgery. I have many I/M's who were to be seen on-site by the General Surgeon & Ophthalmologist. If all these appointments are cancelled it will put CCI way out of compliance with Plata.

25.   In March 26, 2007, the Receiver's counsel sent a letter to MDI's lawyer, Mr. Heffernan. A copy is attached as Exhibit F.

26.   The letter demands an opinion from the California Medical Board within ten days on whether MDI needs a license to undertake its pilot projects at California State Prison, Los Angeles County ("LAC") and California Correctional Institution in Tehachapi ("CCI"). I have no reason to believe that the California Medical Board provides such advisory opinions and does so within ten days.

27.   In the same letter, the Receiver's counsel also demands that MDI provide sensitive and confidential information about its contract rates with doctors and providers. MDI offered to do so, but requested that the Receiver agree to a confidentiality agreement to ensure that the information not be otherwise used or disseminated in the marketplace. In this regard, MDI is not trying to conceal its pricing structure from the Receiver. MDI's bills have been submitted to CDCR and available since November.

28.   MDI is not seeking an "out" from its contract nor does it want to stop work. MDI believes it is doing a great job for the State and providing an important service, but seeks to be compensated for its work and those services provided by participating doctors and hospitals. MDI is committed to the pilot project because it is a successful model – one that works in California just as it works pursuant to contracts between MDI and the Federal Bureau of Prisons. As demonstrated by the results of the pilot project to date, this service model may be of substantial benefit to California in solving its prisoner health care crisis and doing so quickly.

29. The actual details of the primary services MDI performs in the pilot project are:

a. MDI enters into agreements with physicians and hospitals whereby those physicians and hospitals agree to perform medical services at the request of the prison medical staff.

b. MDI works closely with the prison medical staff to provide the framework for excellent, coordinated medical care at a reasonable cost.

c. If an inmate is in need of specialist treatment and such is ordered by the prison medical director, then MDI will set up the appointment with one of the physicians in its network and handle all of the scheduling, billing requirements and facilitate the transfer of clinical information from the specialist to the prison medical director.

d. If there is no qualified physician that meets the prison's criteria, then MDI will try to find such a physician and make the physician a part of the network.

e. If there is no qualified physician who is a part of the network and one cannot be found, then MDI will assist the prison health services staff to secure the services.

f. All medical decisions initiating the process described above are made by the prison health services staff.

g. All medical decisions regarding tests, treatment and the like are made by a licensed specialist.

h. MDI is not involved in any medical decisions.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Ponte Vedra Beach, Florida, this 2nd day of April 2007.

_____
Theodore Willich

**EXHIBIT A**

## CDCR INVOICE PAYMENT STATUS UPDATE

AS OF 03/29/07

| INVOICE NO. | BILLED CHARGES | INVOICE AMOUNT | AMOUNT PAID | INVOICE DATE | DUE DATE | DATE PAID | DAYS PAST DUE | AMOUNT PAST DUE |
|---|---|---|---|---|---|---|---|---|
| CT-O-6101 | 7,053.00 | 2,353.60 | - | 10/27/2006 | 12/11/2006 | | 108 | 2,353.60 |
| CT-I-6102 | 155,992.96 | 67,931.20 | - | 10/31/2006 | 12/15/2006 | | 104 | 67,931.20 |
| CT-O-6102 | 7,854.15 | 1,492.81 | - | 10/31/2006 | 12/15/2006 | | 104 | 1,492.81 |
| LC-I-6111 | 22,750.85 | 8,854.46 | 8,854.46 | 11/3/2006 | 12/18/2006 | 1/3/2007 | 16 | - |
| LC-O-6111 | 250.00 | 248.21 | 248.21 | 11/3/2006 | 12/18/2006 | 1/3/2007 | 16 | - |
| CT-I-6111 | 25,142.10 | 15,576.75 | 15,576.75 | 11/14/2006 | 12/29/2006 | 12/18/2006 | (11) | - |
| CT-O-6111 | 3,215.37 | 1,538.32 | 1,538.32 | 11/14/2006 | 12/29/2006 | 12/18/2006 | (11) | - |
| LC-O-6112 | 9,087.00 | 6,292.62 | 6,292.62 | 11/20/2006 | 1/4/2007 | 1/3/2007 | (1) | - |
| CT-I-6112 | 239,788.64 | 136,618.38 | 136,618.38 | 11/28/2006 | 1/12/2007 | 12/18/2006 | (25) | - |
| CT-O-6112 | 32,052.99 | 11,345.15 | 11,345.15 | 11/28/2006 | 1/12/2007 | 12/18/2006 | (25) | - |
| LC-C-6121 | 11,526.52 | 11,526.52 | - | 12/8/2006 | 1/22/2007 | | 66 | 11,526.52 |
| LC-I-6121 | 36,716.75 | 8,064.57 | - | 12/8/2006 | 1/22/2007 | | 66 | 8,064.57 |
| LC-O-6121 | 700.00 | 744.66 | - | 12/8/2006 | 1/22/2007 | | 66 | 744.66 |
| CT-I-6121 | 459,451.18 | 200,268.29 | - | 12/12/2006 | 1/26/2007 | | 62 | 200,268.29 |
| CT-O-6121 | 44,440.20 | 18,944.72 | - | 12/12/2006 | 1/26/2007 | | 62 | 18,944.72 |
| LC-C-6122 | 6,160.53 | 6,160.53 | - | 12/15/2006 | 1/29/2007 | | 59 | 6,160.53 |
| LC-O-6122 | 4,278.00 | 4,235.58 | - | 12/15/2006 | 1/29/2007 | | 59 | 4,235.58 |
| CT-I-6122 | 182,540.06 | 89,510.71 | - | 12/26/2006 | 2/9/2007 | | 48 | 89,510.71 |
| CT-O-6122 | 54,977.90 | 26,234.95 | - | 12/26/2006 | 2/9/2007 | | 48 | 26,234.95 |
| CT-I-6125 | 207,723.27 | 63,508.19 | - | 12/29/2006 | 2/12/2007 | | 45 | 63,508.19 |
| LC-C-6123 | 8,530.22 | 8,530.22 | - | 12/29/2006 | 2/12/2007 | | 45 | 8,530.22 |
| LC-I-6123 | 42,464.56 | 24,442.10 | - | 12/29/2006 | 2/12/2007 | | 45 | 24,442.10 |
| LC-O-6123 | 19,862.00 | 23,340.63 | - | 12/29/2006 | 2/12/2007 | | 45 | 23,340.63 |
| CT-I-7011 | 104,974.25 | 43,149.97 | - | 1/9/2007 | 2/23/2007 | | 34 | 43,149.97 |
| CT-O-7011 | 32,954.52 | 19,987.62 | - | 1/9/2007 | 2/23/2007 | | 34 | 19,987.62 |
| LC-C-7011 | 2,933.74 | 2,933.74 | - | 1/12/2007 | 2/26/2007 | | 31 | 2,933.74 |
| LC-I-7011 | 275.00 | 224.06 | - | 1/12/2007 | 2/26/2007 | | 31 | 224.06 |
| LC-O-7011 | 22,068.00 | 18,639.00 | - | 1/12/2007 | 2/26/2007 | | 31 | 18,639.00 |
| CT-I-7012 | 109,906.50 | 50,817.57 | - | 1/23/2007 | 3/9/2007 | | 20 | 50,817.57 |
| CT-O-7012 | 88,451.86 | 46,226.21 | - | 1/23/2007 | 3/9/2007 | | 20 | 46,226.21 |
| LC-I-7012 | 4,236.00 | 3,589.34 | - | 1/23/2007 | 3/9/2007 | | 20 | 3,589.34 |
| LC-O-7012 | 63,613.00 | 33,872.18 | - | 1/23/2007 | 3/9/2007 | | 20 | 33,872.18 |
| CT-I-7015 | 111,316.12 | 57,926.87 | - | 1/24/2007 | 3/10/2007 | | 19 | 57,926.87 |
| LC-C-7012 | 29,413.78 | 29,413.78 | - | 1/26/2007 | 3/12/2007 | | 17 | 29,413.78 |
| CT-I-7016 | 330,815.31 | 147,298.28 | - | 1/29/2007 | 3/15/2007 | | 14 | 147,298.28 |
| CT-I-7019 | 21,654.79 | 8,640.43 | - | 1/29/2007 | 3/15/2007 | | 14 | 8,640.43 |
| CT-O-7015 | 2,149.00 | 1,592.96 | - | 1/29/2007 | 3/15/2007 | | 14 | 1,592.96 |
| CT-I-7017 | 489,530.03 | 115,682.05 | - | 1/30/2007 | 3/16/2007 | | 13 | 115,682.05 |
| CT-O-7017 | 4,904.84 | 3,440.81 | - | 1/30/2007 | 3/16/2007 | | 13 | 3,440.81 |
| LC-I-7015 | 19,408.01 | 19,816.35 | - | 1/30/2007 | 3/16/2007 | | 13 | 19,816.35 |
| LC-O-7015 | 4,744.00 | 1,101.47 | - | 1/30/2007 | 3/16/2007 | | 13 | 1,101.47 |
| CT-I-7021 | 116,882.61 | 105,709.39 | - | 2/6/2007 | 3/23/2007 | | 6 | 105,709.39 |
| CT-O-7021 | 100,995.79 | 52,830.95 | - | 2/6/2007 | 3/23/2007 | | 6 | 52,830.95 |
| LC-C-7021 | 13,577.73 | 13,577.73 | - | 2/9/2007 | 3/26/2007 | | 3 | 13,577.73 |
| LC-I-7021 | 6,714.00 | 5,641.34 | - | 2/9/2007 | 3/26/2007 | | 3 | 5,641.34 |
| LC-O-7021 | 186,955.35 | 62,570.64 | - | 2/9/2007 | 3/26/2007 | | 3 | 62,570.64 |
| CT-I-7022 | 334,471.96 | 146,889.47 | - | 2/20/2007 | 4/6/2007 | | - | - |
| CT-O-7022 | 105,552.87 | 59,783.96 | - | 2/20/2007 | 4/6/2007 | | - | - |
| LC-C-7022 | 10,373.52 | 10,271.94 | - | 2/23/2007 | 4/9/2007 | | - | - |
| LC-I-7022 | 222,331.79 | 122,963.41 | - | 2/23/2007 | 4/9/2007 | | - | - |
| LC-O-7022 | 179,648.34 | 79,356.60 | - | 2/23/2007 | 4/9/2007 | | - | - |
| CT-I-7025 | 217,089.87 | 64,994.06 | - | 2/27/2007 | 4/13/2007 | | - | - |
| CT-O-7025 | 23,632.26 | 14,898.43 | - | 2/27/2007 | 4/13/2007 | | - | - |
| CT-I-7026 | 182,915.20 | 121,915.41 | - | 2/28/2007 | 4/14/2007 | | - | - |
| LC-I-7025 | 19,471.00 | 12,917.02 | - | 2/28/2007 | 4/14/2007 | | - | - |
| LC-O-7025 | 43,463.25 | 18,230.35 | - | 2/28/2007 | 4/14/2007 | | - | - |
| CT-C-7031 | 6,602.61 | 6,062.61 | - | 3/6/2007 | 4/20/2007 | | - | - |
| CT-I-7031 | 109,683.26 | 64,367.95 | - | 3/6/2007 | 4/20/2007 | | - | - |
| CT-O-7031 | 97,165.08 | 51,454.27 | - | 3/6/2007 | 4/20/2007 | | - | - |
| LC-C-7031 | 19,993.18 | 19,993.83 | - | 3/9/2007 | 4/23/2007 | | - | - |
| LC-I-7031 | 72,714.81 | 21,206.23 | - | 3/9/2007 | 4/23/2007 | | - | - |
| LC-O-7031 | 38,588.69 | 23,835.00 | - | 3/9/2007 | 4/23/2007 | | - | - |
| CT-I-7032 | 589,937.58 | 287,980.90 | - | 3/20/2007 | 5/4/2007 | | - | - |
| CT-O-7032 | 96,992.97 | 41,094.49 | - | 3/20/2007 | 5/4/2007 | | - | - |
| LC-C-7032 | 7,895.99 | 7,895.99 | - | 3/23/2007 | 5/7/2007 | | - | - |
| LC-I-7032 | 2,107.25 | 240.46 | - | 3/23/2007 | 5/7/2007 | | - | - |
| LC-O-7032 | 97,176.16 | 46,724.45 | - | 3/23/2007 | 5/7/2007 | | - | - |
| TOTAL | 5,928,737.12 | 2,807,522.73 | 180,473.89 | | | | | 1,401,972.02 |